UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

| | |
|---|---|
| RANGE ENERGY INC., | Case No. 26-cv-02311-TSH |
| Plaintiff, | |
| v. | **ORDER RE:  DEFENDANT'S MOTION TO DISMISS; PLAINTIFF'S MOTION TO DISMISS** |
| HYLIION INC., | |
| Defendant. | Re: Dkt. Nos. 16, 28 |

## I.    INTRODUCTION

Plaintiff Range Energy Inc. ("Range") filed a complaint for declaratory judgment of patent non-infringement and invalidity against Defendant Hyliion Inc. ("Hyliion") concerning eight patents owned by Hyliion (the "patents-in-suit") related to electric trailers.  ECF No. 1.  Hyliion filed counterclaims for patent infringement against Range, alleging that Range infringes two of the patents-in-suit.  ECF No. 14.  Pending before the Court are Hyliion's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Def.'s Mot.") (ECF No. 16) and Range's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Pl.'s Mot.") (ECF No. 28).  Hyliion argues that for six of the patents-in-suit, there is no case or controversy between the parties as required by Article III of the Constitution.  Range argues that two of the patents-in-suit are invalid under Section 101 of the Patent Act.  The Court finds this matter suitable for disposition without oral argument pursuant to Civil Local Rule 7-1(b) and **VACATES** the July 2, 2026, hearing.  For the reasons stated below, the Court **DENIES** Hyliion's Motion to Dismiss and **GRANTS IN PART and DENIES IN PART** Range's Motion to Dismiss.[1]

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 29, 29-1, 29-2.

## II.   BACKGROUND

### A.   Factual Background

Hyliion, located in Texas, is the owner of the eight patents-in-suit which are "related to electric trailers."  Compl. ¶ 3 (ECF No. 1).  Range, located in California, is an early-stage technology company developing the "eTrailer System" for trailers used in the trucking industry.  Compl. ¶ 2; Answer at 19 (ECF No. 14).

Range alleges that it does not infringe any of the patents-in-suit and that each of the asserted claims from these patents is invalid.  Compl. ¶¶ 40–167.  Hyliion alleges that Range's eTrailer System infringes two of its patents.  Answer at 21–22.

#### 1.   The Patents-In-Suit

This action involves eight patents-in-suit owned by Hyliion:  U.S. Patent Nos. 10,821,853 (the "'853 Patent"), 12,024,029 (the "'029 Patent"), 9,694,712 (the "'712 Patent"), 9,802,508 (the "'508 Patent"), 10,245,972 (the "'972 Patent"), 10,384,560 (the "'560 Patent"), 10,654,369 (the "'369 Patent"), and 10,967,742 (the "'742 Patent").  Compl. ¶¶ 1, 3; Answer at 2.

"Hyliion does not currently sell any electric-trailer products, but it owns a group of patents related to electric trailers that it is asserting against" Range.  Compl. ¶ 3.  Specifically, the patents-in-suit are part of Hyliion's patent portfolio related to hybrid electric powertrain technology for commercial trailers.  Answer at 2, 19.  Hyliion "admits" that it maintains its patent portfolio "for future use or sale."  *Id.* at 2.  Hyliion alleges that it practiced its patents in the past by building hybrid electric powertrain technology units and "deploying the units in internal tests and selling the units to customers."  *Id.*  Hyliion's counterclaims concern two of the patents-in-suit:  the '853 Patent and the '029 Patent.  *Id.* at 21–22.

##### a.   The '853 Patent

The '853 Patent, entitled "Vehicle Energy Management System And Related Methods," issued on November 3, 2020.  Answer at 20; *see* Answer, Ex. 1 at 1 ('853 Patent) (ECF No. 14-1).  The '853 Patent issued from U.S. Patent Application No. 15/721,345 which was filed on September 29, 2017.  '853 Patent at 1.  The '853 Patent claims a priority date of September 30, 2016.  *Id.* at col. 1 ll. 7–10.  A Certificate of Correction for the '853 Patent issued on April 14,

United States District Court
Northern District of California

2026.  Answer at 20; *see* Answer, Ex. 1 at 41.

The '853 Patent discloses a "through the road (TTR) hybridization strategy" that facilitates "introduction of hybrid electric vehicle technology in a significant portion of current and expected trucking fleets."  '853 Patent Abstract.  The invention relates to "systems and methods to intelligently control regeneration and reuse of captured energy in a TTR hybrid configuration."  *Id.* at Background.

Claim 16, an independent claim, recites:

> A trailer for use in combination with a powered vehicle, the trailer comprising:
>
> one or more on-board sensors configured to detect trailer data including at least one of trailer position data, trailer weight data, trailer speed data, and trailer acceleration data for the trailer traveling along a given trajectory;
>
> a control system operable to compute, based at least in part on the trailer data, a total estimated torque to maintain movement of the trailer along the given trajectory at a substantially constant speed; and
>
> an electric motor-generator coupled to one or more trailer axles, wherein the electric motor-generator is configured to provide a specified torque to the one or more trailer axles; wherein the control system is further operable to computationally estimating a torque applied by the powered vehicle towing the trailer; and wherein based on the computationally estimated torque applied by the powered vehicle and on the computed total estimated torque, applying the specified trailer torque to the one or more trailer axles.

*Id.* at col. 32 ll. 17–38.[2]  In other words, a trailer contains (1) a sensor that detects trailer data; (2) a control system that uses the trailer data to compute the amount of force needed to keep the trailer moving at a constant speed and to estimate the force applied by the powered vehicle towing the trailer; and (3) an electric motor-generator coupled to at least one trailer axle that can supply a specific force to the trailer axle based on the estimated force applied by the powered vehicle and the computed amount of force needed to keep the trailer moving at a constant speed.

The Specification of the '853 Patent teaches the following information.  Techniques for

---

[2] Torque is a measure of rotational force.  *See Torque*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/torque ("a force that produces or tends to produce rotation or torsion (an automobile engine delivers *torque* to the drive shaft)") (emphasis in original).

United States District Court
Northern District of California

reducing large fuel costs in the U.S. trucking industry are desirable as fuel accounts for over 30% of overall industry operating costs. *Id.* at col. 1 ll. 24–31. Existing hybrid technology focuses on "hybridizing the drivetrain of a heavy truck or tractor unit, while any attached trailer or dead axles remain a passive load." *Id.* at col. 1 ll. 32–37. This technology is limited—improved hybrid drivetrains for introduction in new towing vehicles only addresses a small fraction of existing fleets given the number of towing units already in service and their longevity. *Id.* at col. 1 ll. 32–47.

TTR hybridization can improve fuel efficiency and performance by "supplementing motive forces delivered through a primary drivetrain and fuel-fed engine with supplemental torque delivered at one or more electrically-powered drive axles." *Id.* at col. 1 ll. 51–67. In short, instead of acting as a passive load, the vehicle being towed contributes force through its electric motor which supplements the force provided by the towing vehicle's combustion engine. The invention uses control strategies to deliver supplemental force through an electrically-powered axle "in a manner that follows operational parameters or computationally estimates states of the primary drivetrain and/or fuel-fed engine, but does not itself participate in control of the fuel-fed engine or primary drivetrain." *Id.* at col. 2 ll. 1–12. The invention senses "operating parameters that can be observed and/or kinematic variables" to determine states of the towing vehicle and inform its controller. *Id.* So instead of directly relying on the towing vehicle for information, the invention can infer states of the towing vehicle using sensed data.

A "trailer" is "an unpowered vehicle towed by a powered vehicle"; the powered vehicle is also known as a "tractor." *Id.* at col. 9 ll. 33–45. "A trailer, as typically an unpowered vehicle, includes one or more passive axles" that may be replaced by "powered axles" which are part of a hybrid suspension system. *Id.* at col. 9 ln. 24–col. 10 ln. 37. "'On-board sensors' may be used to describe sensors that are coupled to or part of the hybrid suspension system, sensors that are coupled to or part of a trailer to which the hybrid suspension system is attached, as well as remote sensors[.]" *Id.* at col. 18 ll. 41–51. "A variety of control systems designs are contemplated[.]" *Id.* at col. 17 ln. 12–col. 18 ln. 30. The control system is associated with a "control system circuit." *Id.* at col. 6 ll. 1–11, col. 14 ll. 5–11. In general, the control system "seeks to follow and

United States District Court
Northern District of California

supplement the motive inputs of the fuel-fed engine and primary drivetrain" by estimating these inputs. *Id.* at col. 7 ll. 20–30.

The Specification discloses several embodiments of the claimed invention. Some embodiments contain "an ECMS-type controller for electrically-powered drive axle" that "is not directly responsive to driver-, autopilot-, or cruise-type throttle controls of the fuel-fed engine" or primary drivetrain.[3] *Id.* at col. 2 ll. 12–29. Instead, the controller responds to "sensed pressure in a brake line" and "computationally-estimated operational states" of the combustion engine. *Id.* In some cases, the controller obtains information "retrievable via a CANbus or SAE J1939 vehicle bus interface such as commonly employed in heavy-duty trucks." *Id.* Some embodiments compute a total estimated torque using "one or more of a driver input torque, an air drag torque, a road drag torque, a road grade torque, an acceleration torque, and a braking torque." *Id.* at col. 3 ll. 4–12. Some embodiments further include "a hybrid suspension system." *Id.* at col. 5 ll. 19–39.

The Certificate of Correction for the '853 Patent corrects the Patent as follows:

> In the Claims
>
> Claim 16, Column 32, Lines 32–34: 'the control system is further operable to computationally estimating a torque applied by the powered vehicle towing the trailer' should be changed to 'the control system is further operable to computationally estimate a torque applied by the powered vehicle towing the trailer'

Answer, Ex. 1 at 41.

### b.     The '029 Patent

The '029 Patent, entitled "Trailer-Based Energy Capture And Management," issued on July 2, 2024. Answer at 21; *see* Answer, Ex. 2 at 1 ('029 Patent) (ECF No. 14-2). The '029 Patent issued from U.S. Patent Application No. 18/311,376 which was filed on May 3, 2023. '029 Patent at 1. The '029 Patent, through continuations, claims a priority date of May 1, 2015. *Id.* at col. 1 ll. 6–23. A Certificate of Correction for the '029 Patent issued on April 7, 2026. Answer at 21; *see* Answer, Ex. 2 at 34.

The '029 Patent discloses a "through the road (TTR) hybridization strategy" that facilitates

---

[3] "ECMS" stands for "equivalent consumption minimization strategy." '853 Patent at col. 2 ll. 1–4. The invention uses "control strategies such as" an ECMS or adaptive ECMS. *Id.*

United States District Court
Northern District of California

"introduction of hybrid electric vehicle technology in a significant portion of current and expected trucking fleets." '029 Patent Abstract.  The technology is built into new vehicles in some cases and retrofitted onto existing vehicles in some cases.  *Id.*  The invention relates to "systems and methods to intelligently control regeneration and reuse of captured energy in a TTR hybrid configuration." *Id.* at Background.

Claim 1, an independent claim, recites:

> A towed vehicle for use in combination with a towing vehicle, the towed vehicle comprising:
>
> a suspension assembly including a frame, a suspension, one or more drive axles, and one or more wheels coupled to respective ones of the one or more drive axles;
>
> at least one electric motor-generator coupled to at least one of the drive axles, wherein, in a first mode of operation, the at least one electric motor-generator provides a positive motive rotational force to the at least one of the drive axles to supplement the motive forces applied by the towing vehicle, and in a second mode of operation, the at least one electric motor-generator receives a negative rotational force from the at least one of the drive axles from which the at least one electric motor-generator generates energy by regenerative braking;
>
> an energy store from which energy is supplied to power the at least one electric motor-generator in the first mode of operation and to which energy is supplied by regenerative braking in the second mode of operation;
>
> one or more sensors that sense data for at least one condition of the towed vehicle or the towing vehicle; and
>
> a controller that operates autonomously from the towed vehicle and is in communication with the at least one electric motor-generator, the controller receives sensor input from the one or more sensors and transitions the at least one electric motor-generator between the first mode of operation, the second mode of operation, and a third mode of operation, during motion of the towed vehicle in combination with the towing vehicle over a roadway, based on the data from the one or more sensors.

*Id.* at col. 24 ll. 31–64.  In other words, a towed vehicle contains (1) a suspension assembly that contains at least one drive axle; (2) an electric motor-generator, coupled to at least one drive axle, that can operate in three modes:  a first mode of operation (motor provides positive force to the drive axle), a second mode of operation (generator receives negative force from the drive axle), and a third mode of operation; (3) an energy store that supplies energy to the electric motor-

6

generator in the first mode of operation and receives energy from the electric motor-generator in the second mode of operation; (4) at least one sensor that senses data for at least one condition of the towed vehicle or towing vehicle; and (5) an autonomous controller that uses sensed data to transition the electric motor-generator between the three modes of operation based on those data.

Claim 2, a dependent claim, recites:

> The towed vehicle of claim 1, wherein, in the third mode of operation, the at least one electric motor-generator operates in a passive mode.

*Id.* at col. 24 ll. 65–67.

The Specification of the '029 Patent teaches the same background information as the '853 Patent. *Compare* '029 Patent at col. 1 ln. 29–col. 2 ln. 26 *with* '853 Patent at col. 1 ln. 16–col. 2 ln. 12. The Specification of the '029 Patent teaches the following additional information. The invention concerns "designs and techniques for providing an energy management system and related methods in the context of systems and components typical in the heavy trucking industry." '029 Patent at col. 5 ll. 39–42. Regenerative braking allows for "energy recapture." *Id.* at col. 14 ll. 4–21. The "hybrid suspension system is configured to operate largely independently of the fuel-fed engine and primary drivetrain of a powered vehicle." *Id.* at col. 8 ll. 1–5. In some cases, it operates "autonomously from the engine and drivetrain controls of the powered vehicle." *Id.* This means that the hybrid suspension system can

> operate without commands or signals from the powered towing vehicle, to independently gain information about itself and the environment, and to make decisions and/or perform various functions based on one or more algorithms stored in the controller, as described in more detail below.

*Id.* at col. 8 ll. 5–15. Autonomous operation "does not preclude observation or estimation of certain parameters or states of a powered vehicle's fuel-fed engine or primary drivetrain[.]" *Id.*

The Specification discloses several embodiments of the claimed invention. Some embodiments provide a hybridized suspension assembly affixed underneath a vehicle as a replacement to a passive suspension assembly. *Id.* at col. 5 ll. 39–52. By providing a powered axle to a towed vehicle, the hybrid suspension system in some embodiments results in a significant reduction in fuel consumption and improvement in fuel efficiency of the towing vehicle. *Id.* at

United States District Court
Northern District of California

7

col. 8 ll. 53–58.  In some embodiments, "the third mode of operation may be referred to as a 'passive mode.'"  *Id.* at col. 8 ll. 45–52.

The Certificate of Correction for the '029 Patent corrects the Patent as follows:

> In the Claims
>
> Claim 11, Column 32, Lines 55–56:  'a controller that operates autonomously from the towed vehicle' should be changed to 'a controller that operates autonomously from the towing vehicle'

Answer, Ex. 2 at 34.  On April 23, 2026, Hyliion filed a certificate of correction to change "towed" to "towing" in Claim 1 which the U.S. Patent and Trademark Office approved on May 4, 2026.  Declaration of Kristina Martin-Frisby in Support of Range's Motion to Dismiss (ECF No. 28-1), Exs. F (ECF No. 28-7), G (ECF No. 28-8).

### c.      The Six Additional Patents

The patents-in-suit include six additional patents:  the '712 Patent, the '508 Patent, the '972 Patent, the '560 Patent, the '369 Patent, and the '742 Patent (collectively, the "Six Additional Patents").  Compl. ¶¶ 1, 35.  The parties dispute whether an actual controversy exists regarding the Six Additional Patents.  According to Range, Hyliion asserts Range infringes the following claims in the Six Additional Patents.  *Id.* ¶¶ 40–129.

Claim 8 of the '712 Patent recites a method for replacing an existing trailer suspension assembly with a hybridizing suspension assembly that provides assistive motive force and regenerative braking force.  *Id.* ¶ 41.

Claim 1 of the '508 Patent recites an apparatus for use in a tractor-trailer vehicle as a hybridizing suspension assembly that uses a controller to transition between three modes of operation based on sensor inputs.  *Id.* ¶ 48.  Claim 10 of the '508 Patent recites a method for replacing an existing trailer suspension assembly with a hybridizing suspension assembly that provides assistive motive force and regenerative braking force for a trailer mechanically coupled in a tractor-trailer vehicle.  *Id.* ¶ 49.

Claim 1 of the '972 Patent recites an apparatus that allows a towed vehicle to supplement primary motive forces applied by a towing vehicle and contains an auxiliary power unit (APU) interface to supply electrical power to the towing vehicle and an inverter.  *Id.* ¶ 63.  Claim 4 of the

United States District Court
Northern District of California

'972 Patent recites an apparatus similar to that in Claim 1 except it contains an electrical cable instead of an inverter. *Id.* ¶ 64. Claim 7 of the '972 Patent recites a method for supplying supplemental torque similar to that performed by the apparatus in Claim 1. *Id.* ¶ 65. Claim 10 of the '972 Patent recites a method for supplying supplemental torque similar to that performed by the apparatus in Claim 4. *Id.* ¶ 66.

Claim 1 of the '560 Patent recites an apparatus for use in a vehicle including a fuel-fed engine, configured to supply primary motive forces to the vehicle, that uses a controller to transition between three modes of operation based on sensor inputs. *Id.* ¶ 80. Claim 11 of the '560 Patent recites a method for replacing a trailer's existing suspension assembly with a hybridizing suspension assembly that includes a controller to transition between three modes of operation based on sensor inputs. *Id.* ¶ 81. Claim 18 of the '560 Patent recites an apparatus similar to that in Claim 1 but that contains two electric motor-generators. *Id.* ¶ 82.

Claim 1 of the '369 Patent recites an apparatus for use in a tractor-trailer vehicle that uses a controller to transition between three modes of operation based on sensor inputs and predetermined, corresponding threshold values. *Id.* ¶ 95. Claim 9 of the '369 Patent recites a method for transitioning between three modes of operation similar to that performed by the apparatus in Claim 1. *Id.* ¶ 96.

Claim 1 of the '742 Patent recites a trailer for use in a tractor-trailer vehicle that uses at least two motor-generators and a controller to transition each motor-generator between two modes of operation based on sensor inputs. *Id.* ¶ 111.

### 2.    The Accused Product

Range is "developing the 'eTrailer System,' electrically-powered trailer component kits to uplift existing trailers for the trucking industry." Compl. ¶ 2. The eTrailer System "will improve fuel efficiency and vehicle safety and reduce this industry's environmental impact." *Id.* Range has demonstrated its eTrailer System technology in videos on Range's website. *Id.* ¶ 35.

Hyliion alleges that Range's eTrailer System (the "Accused Product") reads on Claim 16 of the '853 Patent and Claim 1 of the '029 Patent. Answer at 21–22. Specifically, Range's manufacture, use, or sale of the Accused Product and its public demonstration of the Accused

Product "in testing and customer pilot deployments" constitute infringing actions. *Id.* at 19.

### 3.    The Parties' Activities

Range alleges the following in the Complaint.  On August 15, 2025, Hyliion's attorney (Brett Pinkus) sent a Notice of Infringement letter to Range's GC (Joonsik Maing) stating Hyliion owns "an extensive portfolio of patents that cover hybrid-electric technology for tractor trailers," and Range's "eTrailer System practices one or more of Hyliion's patents."  Compl. ¶ 15; *see* Declaration of Kristina Martin-Frisby in Support of Range's Opposition ("Martin-Frisby Decl.") (ECF No. 23-1), Ex. A ("Not. of Infringement") (ECF No. 23-2).  The letter includes an attachment titled, "Hyliion's Patents for Hybrid Electric Powered Axle for Trailers," that lists twenty-two patents in Hyliion's portfolio and includes all eight patents-in-suit.  Not. of Infringement at 3–4.  The letter states that Hyliion provides infringement claim charts for the '853 Patent and '029 Patent "as representative examples" of Range's infringement and that Hyliion offers a license to its patent portfolio.  *Id.* at 1; Compl. ¶ 15.  Finally, the letter requests a response from Range by September 5, 2025.  Not. of Infringement at 1; Compl. ¶ 15.

The parties exchanged several communications between August 2025 and March 2026 regarding Hyliion's allegation of patent infringement.  Compl. ¶¶ 15–39.  On November 14, 2025, Hyliion's counsel sent Range's outside counsel a letter requesting "a call between the parties' executive teams within two weeks following Thanksgiving to discuss a path forward" and stating, "[g]iven the ongoing nature of Range's infringing activities and the need for clarity heading into the new year, it is imperative that the parties reach a resolution before year-end."  *Id.* ¶ 17.  On a videoconference on December 16, 2025, Hyliion told Range it "wanted to get a resolution early in the New Year."  *Id.* ¶ 20.

On February 5, 2026, Hyliion wrote Range, requesting a videoconference and stating:

> it's clear we are now nearing an impasse due to a lack of meaningful action from [Range] . . . . We need a clear position from [Ragnge] on the path forward.  If we do not receive a substantive response, Hyliion will take steps to move forward in a manner that best protects its interests . . . . This is not a hypothetical exercise, we are serious, and we expect it to be treated accordingly.

*Id.* ¶ 26.  On February 9, 2026, the parties participated in a videoconference; Range expressed

10

concerns over inventorship and Hyliion "closed the call by stating that they were going to decide that week whether to file a lawsuit, and that, if [Range] wanted to avoid litigation, it needed to respond to Hyliion's patent license offer before the end of the week." *Id.* ¶ 27.

On February 13, 2026, Range's outside counsel sent a letter to Hyliion's counsel raising problems with Hyliion's infringement allegations and adding "new such problems and new issues with the asserted claims' validity." *Id.* ¶ 28. On February 20, 2026, the parties participated in a videoconference; Hyliion stated that "the problems detailed in [Range's] February 13 letter were 'overly technical,' that the trier of fact in litigation would rule on their side, and that they were ready to file a complaint." *Id.* ¶ 32. On February 27, 2026, Hyliion sent Range a draft license agreement. *Id.* ¶ 33. Range responded on March 3, 2026, explaining Range "was not prepared to sign any license agreement because it still did not have responses to the substantive points its counsel had raised about alleged infringement and invalidity back on February 13." *Id.* ¶ 34.

On March 6, 2026, the parties participated in a videoconference; Hyliion told Range that Hyliion "needed to have a final decision by next Friday, March 13, or they would be forced to do what they need to do to enforce their patents." *Id.* ¶ 36.

On March 10, 2026, Pinkus sent a letter to Range's outside counsel that "amplified Hyliion's threat, asserting infringement of thirteen claims spread across six additional Hyliion patents, the '712, '508, '972, '560, '369, and '742 patents." *Id.* ¶ 35; *see* Martin-Frisby Decl., Ex. E ("March 2026 Letter") (ECF No. 23-6). The letter states there "are a number of articles and videos available online of Range themselves installing the e-Trailer system on Range's own trailers for demonstrations and testing and providing Range's trailers to customers for use in pilot programs" which constitute "direct infringement." March 2026 Letter at 1; *see* Compl. ¶ 35 (alleging March 2026 Letter notes Range's "own demonstration of its technology in videos on [Range's] website constituted infringement"). In a section titled, "Infringement of Hyliion's Other Related Patents," the letter states:

> In addition to claim 16 of the '853 Patent and claim 1 of the '029 Patents [*sic*], Range is or may be directly infringing or inducing and/or contributing to the infringement of other claims of several additional Hyliion's related patents in this same family, including, but not limited to:

11

| U.S. Patent No. | Claims |
|---|---|
| 9,694,712 | at least claim 8 |
| 9,802,508 | at least claims 1 and 10 |
| 10,245,972 | at least claims 1, 4, 7, 10 |
| 10,384,560 | at least claims 1, 11, and 18 |
| 10,654,369 | at least claims 1 and 9 |
| 10,967,742 | at least claim 1 |

March 2026 Letter at 10.  The letter further states, "Hyliion believes that Range now has all the information requested and that continuing to exchange letters on the substantive merits will no longer be productive," and "[i]f Range wishes to continue to debate the infringement issue, that will need to occur in litigation."  Compl. ¶ 35; March 2026 Letter at 10.  The letter concludes: "Hyliion expects Range to enter into the License Agreement by March 31, 2026."  March 2026 Letter at 10 (emphasis omitted).

On March 13, 2026, the parties participated in a videoconference; Range made a new settlement offer, and Hyliion stated it "was 'done with back-and-forth negotiations,' would not respond to [Range's] offer, and would be doing what they thought was 'best for Hyliion.'"  *Id.* ¶ 38.

Overall, Hyliion "has alleged and continues to allege" that Range infringes the eight patents-in-suit "directly or indirectly."  *Id.* ¶¶ 40–129.

**B.      Procedural Background**

On March 17, 2026, Range filed this declaratory judgment action against Hyliion seeking a judgment of non-infringement and invalidity for each of the asserted claims in the patents-in-suit.  ECF No. 1 ("Compl.").  Range alleges sixteen causes of action:  (1) Non-Infringement of the '712 Patent; (2) Non-Infringement of the '508 Patent; (3) Non-Infringement of the '972 Patent; (4) Non-Infringement of the '560 Patent; (5) Non-Infringement of the '369 Patent; (6) Non-Infringement of the '853 Patent; (7) Non-Infringement of the '742 Patent; (8) Non-Infringement of the '029 Patent; (9) Invalidity of the '712 Patent; (10) Invalidity of the '508 Patent; (11) Invalidity of the '972 Patent; (12) Invalidity of the '560 Patent; (13) Invalidity of the '369 Patent; (14) Invalidity of the '853 Patent; (15) Invalidity of the '742 Patent; and (16) Invalidity of the '029 Patent.  Compl. ¶¶ 40–167.

On April 21, 2026, Hyliion filed an Answer.  ECF No. 14 ("Answer").  Hyliion alleges two

United States District Court
Northern District of California

counterclaims against Range:  (1) Infringement of the '853 Patent; and (2) Infringement of the '029 Patent.  Answer at 21–22.

On April 21, 2026, Hyliion filed its instant Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).  ECF No. 16 ("Def.'s Mot.").  Hyliion seeks dismissal of Claims 1–5, 7, 9–13, and 15 in Range's Complaint on the ground that Range does not demonstrate the existence of an actual case or controversy.  Def.'s Mot. at 1.  On May 5, 2026, Range filed an opposition.  ECF No. 23 ("Pl.'s Opp.").  On May 12, 2026, Hyliion filed a reply.  ECF No. 27 ("Def.'s Reply").

On May 12, 2026, Range filed its instant Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 28 ("Pl.'s Mot.").  Range seeks dismissal of both Hyliion's patent infringement counterclaims on the ground that the asserted claims are invalid.  Pl.'s Mot. at 1.  On May 27, 2026, Hyliion filed an opposition.  ECF No. 34 ("Def.'s Opp.").  On June 2, 2026, Range filed a reply.  ECF No. 35 ("Pl.'s Reply").

### III.   MOTIONS TO DISMISS

Hyliion moves to dismiss twelve of Range's causes of action for declaratory judgment of patent non-infringement and invalidity.  Def.'s Mot. at 1.  Hyliion argues the Court lacks subject matter jurisdiction over these claims because they "do not satisfy the constitutional requirement of an actual case or controversy."  *Id.*

Range moves to dismiss both of Hyliion's patent infringement counterclaims for failing to state a cognizable claim.  Pl.'s Mot. at 1.  Range argues that the asserted claims of the '853 Patent and '029 Patent are invalid under Section 101 of the Patent Act.  *Id.*

In sum, the Court concludes that Range establishes an actual controversy exists regarding Range's infringement of the asserted patent claims in the Six Additional Patents.  Therefore, dismissal of Claims 1–5, 7, 9–13, and 15 in Range's Complaint is not warranted.  The Court further concludes that Hyliion fails to allege a cognizable claim based on Claim 16 of the '853 Patent.  Therefore, dismissal of Hyliion's Counterclaim 1 is warranted.  However, the Court concludes that Hyliion alleges a cognizable claim based on Claim 1 of the '029 Patent.  Therefore, dismissal of Hyliion's Counterclaim 2 is not warranted.

United States District Court
Northern District of California

13

**A.      Hyliion's Motion To Dismiss Pursuant To Rule 12(b)(1)**

Hyliion argues that the claims in Range's Complaint premised on the Six Additional Patents fail for want of subject matter jurisdiction because they "do not satisfy the constitutional requirement of an actual case or controversy."  Def.'s Mot. at 1.  Hyliion requests the Court dismiss these claims without prejudice "on jurisdictional grounds only," and "expressly reserve Hyliion's right to assert claims with respect to the [Six] Additional Patents in any future proceeding."  *Id.* at 9:3–23.

**1.      Legal Standard**

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  Accordingly, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.* (cleaned up); *accord Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).  "To adjudicate a case, a federal court must ensure that both constitutional and statutory jurisdiction are satisfied."  *Faulk v. JELD-WEN, Inc.*, 159 F.4th 618, 621 (9th Cir. 2025).  The latter requirement is known as "subject matter jurisdiction."  *Id.*

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to move to dismiss a lawsuit for lack of subject matter jurisdiction.  Lack of Article III standing is properly raised in a Rule 12(b)(1) motion.  *Iten v. Los Angeles*, 81 F.4th 979, 985 (9th Cir. 2023).  The party asserting federal subject matter jurisdiction must establish standing by a preponderance of the evidence.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

A jurisdictional challenge may be facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id.*  Where the attack is facial, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction.  *Warth v. Seldin*,

United States District Court
Northern District of California

422 U.S. 490, 501 (1975). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. Where the attack is factual, "the court need not presume the truthfulness of the plaintiff's allegations." *Id.* Further, dismissal of a complaint without leave to amend should only be granted where the jurisdictional defect cannot be cured by amendment. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

The law of the Court of Appeals for the Federal Circuit governs with respect "to issues of substantive patent law." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803 (Fed. Cir. 2000); *see In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 314 (N.D. Cal. 2007) ("Federal Circuit law controls as to matters within its jurisdiction."). As such, Federal Circuit law governs a district court's analysis "as to whether an actual controversy exists under the Declaratory Judgment Act when the underlying merits of an action involve patent infringement and/or validity." *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1347 (Fed. Cir. 2025) ("*Mitek II*") (citation omitted). "However, for non-patent issues, such as whether a Rule 12(b)(1) motion should be treated as a facial or a factual challenge," district courts apply the law of the regional circuit in which they sit—here, the Ninth Circuit. *Id.*

### 2.    Actual Controversy

Hyliion argues that for Claims 1–5, 7, 9–13, and 15 in Range's Complaint, Range does not establish an "actual case or controversy," as required by Article III and the Declaratory Judgment Act. Def.'s Mot. at 5:4–8:16. According to Hyliion, these claims fail because (1) they "entirely rest upon one bare, equivocal sentence"; and (2) the "totality of Hyliion's conduct does not establish jurisdiction" over the Six Additional Patents. *Id.* Range contends that "Hyliion's actions created a controversy around the Six Additional Patents." Pl.'s Opp. at 4:11–6:20.

#### a.    Case-Or-Controversy Requirement

Article III of the U.S. Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies[.]'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). The Declaratory Judgment Act provides that federal courts "may declare the rights and other legal relations of any interested party seeking such declaration," in "a case of actual controversy within its jurisdiction."

15

28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007).

To satisfy Article III's case-or-controversy requirement, a declaratory judgment action must involve a dispute that is "definite and concrete, touching the legal relations of parties having adverse legal interests"; the dispute must also be "real and substantial" and "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (cleaned up). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citation omitted).

A "declaratory judgment plaintiff must plead facts sufficient to establish jurisdiction at the time of the complaint, and post-complaint facts cannot create jurisdiction where none existed at the time of filing." *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 34 F.4th 1334, 1340 (Fed. Cir. 2022) ("*Mitek I*") (citation omitted). In a declaratory judgment action for patent non-infringement, "jurisdiction exists where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *Id.* at 1345. "But a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, does not suffice." *Id.* (cleaned up).

Here, Hyliion does not dispute the truth of Range's allegations but merely disputes their characterization by Range. *See, e.g.,* Def.'s Mot. at 3:1–5 (citing Compl. ¶ 35; Answer ¶ 35) ("[Range's] Complaint characterizes that letter as having 'amplified' Hyliion's infringement threats, a characterization which Hyliion denied in its Answer."). Because Hyliion's arguments focus on the sufficiency of the Complaint's allegations, the Court construes Hyliion's Motion as a facial attack on the Court's subject matter jurisdiction. *Cf. Zoho Corp. Pvt. Ltd. v. Orion Labs Tech, LLC*, No. 25-cv-08727-VKD, 2026 WL 816229, at *8 (N.D. Cal. Mar. 24, 2026) (adjudicating jurisdictional dispute over plaintiff's claims for declaratory judgment of non-

infringement).  As such, the Court considers the Complaint, and materials subject to judicial notice or incorporation-by-reference, in resolving Hyliion's Motion.[4]  *See Leite*, 749 F.3d at 1121 ("The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)[.]"); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (explaining district court may consider documents that it judicially notices or incorporates into the complaint by reference when ruling on 12(b)(6) motion).

### b.    Controversy Over Patent Infringement

"In essence, a controversy exists where a patentee's actions 'can be reasonably inferred as demonstrating intent to enforce a patent.'"  *Okta, Inc. v. Biogy, Inc.*, – F. Supp. 3d –, No. 25-cv-03329-AMO, 2026 WL 497472, at *3 (N.D. Cal. Feb. 23, 2026) (citing *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 787 F. App'x 691, 700 (Fed. Cir. 2019)).  Thus, the question here is whether Range alleges facts that demonstrate Hyliion's intent to enforce the Six Additional Patents.  *See* Def.'s Mot. at 5:12–13 ("The test is not whether [Range] subjectively feared suit, but whether Hyliion objectively engaged in enforcement conduct directed to the [Six] Additional Patents.").

The Federal Circuit has explained that determining whether an actual patent infringement controversy exists requires separate consideration of the distinct "types of infringement (notably, direct infringement, inducement of infringement, and contributory infringement) of the claims of the patents-in-suit, and of the bearing on any infringement of such claims" of the alleged facts.  *Mitek I*, 34 F.4th at 1343; *see Mitek II*, 139 F.4th at 1348 (analyzing each type of infringement separately).  The inquiry focuses on whether, under the totality of the circumstances, there is enough for an accused infringer to reasonably interpret the patentee's actions as at least an implicit

---

[4] The Court incorporates by reference the Notice of Infringement (ECF No. 23-2) and March 2026 Letter (ECF No. 23-6) as Hyliion does not contest the authenticity or relevance of the documents, and Range's claims necessarily rely upon the Notice of Infringement and March 2026 Letter.  *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (explaining under the doctrine of incorporation-by-reference, a court may consider a document not attached to the complaint provided the complaint "necessarily relies" on the document or contents thereof, the document's authenticity is uncontested, and the document's relevance is uncontested); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").  Therefore, the Court considers these documents incorporated for purposes of Hyliion's Motion and assumes their contents are true for purposes of the Motion.  *Ritchie*, 342 F.3d at 908.

assertion of infringement. *Mitek I*, 34 F.4th at 1345. The Patent Act states:

> whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a). Direct patent infringement can occur literally or by equivalence—literal infringement requires that the accused product contain each and every limitation of the asserted patent claim. *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000); *Mitek II*, 139 F.4th at 1348.

The Court concludes that under the totality of the circumstances, Range demonstrates the existence of an actual infringement controversy between the parties regarding the Six Additional Patents. To start, Hyliion is incorrect that Range bases its claims for the Six Additional Patents on a "single ambiguous sentence" in "a single letter." Def.'s Mot. at 5:4–6:18. Range alleges that Hyliion's Notice of Infringement asserts that Range requires a license to twenty-two Hyliion patents—including the Six Additional Patents—because the Accused Product practices one or more of Hyliion's patents; that Hyliion created claim charts for the '853 Patent and '029 Patent "as representative examples" of Range's infringement; that in the March 2026 Letter, Hyliion identifies thirteen claims from the Six Additional Patents that Range "is or may be" infringing and states these patents are "in the same family" as the '853 Patent and '029 Patent; that Hyliion issued deadlines for responses and threatened suit several times; and that Hyliion does not practice the patents-in-suit. Pl.'s Opp. at 4:11–6:20; *see* Compl. ¶¶ 3, 15, 17, 20, 26–27, 32, 35–36, 38; Not. of Infringement at 1, 3–4; March 2026 Letter at 10. Range further alleges that the Six Additional Patents are related to the '853 Patent and '029 Patent as they are all directed to electric trailers. Compl. ¶¶ 1, 35, 40–129. In addition, Hyliion's claim charts for the '853 Patent and '029 Patent demonstrate that Hyliion asserts that Range's eTrailer System directly infringes Claim 16 of the '853 Patent and Claim 1 of the '029 Patent as the charts assert the Accused Product contains each and every limitation of those asserted claims. *See* Not. of Infringement at 5–34 (Claim Charts); Def.'s Mot. at 5:16–22 (stating Hyliion provided "two detailed claim charts identifying specific patent claims, mapping each element of each claim to specific components of [Range's]

United States District Court
Northern District of California

18

eTrailer System").

Collectively, Range's allegations and items in the record demonstrate that at the time the Complaint was filed, Range reasonably interpreted Hyliion's actions as an intent to enforce the Six Additional Patents and an assertion of direct patent infringement of the Six Additional Patents. First, contrary to Hyliion's assertion, there *is* a "licensing demand specifically tied to the [Six] Additional Patents." Def.'s Mot. at 7:19–28. Indeed, Hyliion's Notice of Infringement lists the Six Additional Patents specifically, states that the '853 Patent and '029 Patent are "representative examples" of Range's direct infringement, and offers a license to Hyliion's patent portfolio which includes the Six Additional Patents. Pl.'s Opp. at 4:20–24, 8:11–17. Second, Range's allegations that Hyliion does not practice the Six Additional Patents and that it imposed deadlines on Range in correspondences identifying the Six Additional Patents support the existence of jurisdiction. *Id.* at 5:19–6:2; *see Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363–64 (Fed. Cir. 2009) (finding imposition of "a short deadline for a response" and receipt of "correspondence from a non-competitor patent holding company" support inference of intent to enforce a patent).

Finally, Hyliion's March 2026 Letter identifies specific claims of the Six Additional Patents that Range "is or may be infringing" and states these patents are in the "same family" as the '853 Patent and '029 Patent which Hyliion accuses Range of directly infringing. Pl.'s Opp. at 5:2–8. Hyliion incorrectly casts Range's allegations as positing a "patent family rule": that "any mention of a patent creates jurisdiction over every patent in its patent family." Def.'s Reply at 1:20–2:12, 4:17–26. Instead, Range alleges that Hyliion's affirmative act of accusing Range of infringing specific claims of the Six Additional Patents, coupled with the relatedness of the eight patents-in-suit, demonstrates an intent to enforce all eight patents. To be sure, declaratory judgment jurisdiction must be evaluated on a claim-by-claim basis, requiring an affirmative act by the patentee as to each asserted claim. *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1281 (Fed. Cir. 2012); *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir. 2007); *see* Def.'s Mot. at 7:3–10. But Range alleges affirmative conduct by Hyliion directed at each asserted claim in the Six Additional Patents—Hyliion itself listed the asserted claims in the March 2026 Letter. Thus, contrary to Hyliion's assertion, the Six Additional Patents

United States District Court
Northern District of California

19

*were* identified as "key" and "prioritized." Def.'s Reply at 3:25–4:5; *see* Pl.'s Opp. at 4:20–5:8. They were plucked from a list of patent numbers in the Notice of Infringement and narrowed to individual claims that Range is infringing. *See* Pl.'s Opp. at 7:19–21 ("Hyliion identified six patents from its portfolio of 22, and thirteen specific claims from those patents."). And despite Hyliion's assertion, Range sufficiently alleges relatedness: Range alleges that all patents-in-suit are related to hybrid electric trailers and are in the same family, alleges the language of the asserted claims from the Six Additional Patents, and alleges that Hyliion provided claim charts for two patents as representative examples of Range's direct infringement of two patents within the patent family. Def.'s Mot. at 4:6–16; Pl.'s Opp. at 4:20–5:18; *cf. Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1358 (Fed. Cir. 2013) (finding patentee's accusation of infringement of "closely related" patent supports presence of controversy over other related patents). Overall, Range establishes that Hyliion's accusation that Range directly infringes the '853 Patent and '029 Patent applies equally to the Six Additional Patents.

Moreover, Hyliion cites no authority holding that jurisdiction exists only where a patentee provides detailed claim charts or discusses infringement allegations in depth for every asserted patent claim. Def.'s Mot. at 5:16–6:3; Pl.'s Opp. at 7:23–8:3. In fact, the Federal Circuit recognized that "it is implausible (especially after *MedImmune* and several post *MedImmune* decisions from this court) to expect that a competent lawyer drafting such correspondence for a patent owner would identify specific claims, present claim charts, and explicitly allege infringement." *Hewlett-Packard*, 587 F.3d at 1362. Further, the Court agrees with Range that a reasonable inference exists that by asserting the Six Additional Patents in the March 2026 Letter and imposing a short deadline, Hyliion was creating pressure for signing its license. Pl.'s Opp. at 7 n.1. Therefore, under the totality of the circumstances—Range's allegations of Hyliion's licensing demands, Hyliion's correspondences identifying the Six Additional Patents and providing detailed claim charts for related patents, Hyliion's repeated imposition of deadlines and threats of litigation, and Hyliion's non-practicing status—there is enough for Range to reasonably

interpret Hyliion's actions as asserting direct infringement of the Six Additional Patents.[5]  *Cf. Mitek I*, 34 F.4th at 1344–45 (finding actual infringement controversy existed between a declaratory judgment plaintiff's customers and a patentee based on allegations of patent licensing demand letters to customers, and a single letter attached to the complaint that did not threaten litigation, include claim charts for the patents-in-suit, or identify particular products as infringing, but provided a claim chart that addressed "a different, unrelated patent" in detail, viewed in light of patentee's litigation against one customer).

Hyliion's remaining arguments do not compel a different conclusion.  Hyliion spills much ink arguing that because the March 2026 Letter states Range "is or may be" infringing the Six Additional Patents, there is no affirmative act by Hyliion regarding these patents.  Def.'s Mot. at 5:23–6:18, 7:11–18.  But there are no magic words required by the patentee for declaratory judgment jurisdiction to vest; any communications by the patentee must be analyzed considering all circumstances.  Pl.'s Opp. at 6:25–7:21; *see 3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1379 (Fed. Cir. 2012) (finding use of "the term 'may infringe' instead of 'does infringe' is immaterial in light of" patentee's other actions); *Mitek I*, 34 F.4th at 1345 (finding patentee's letter stating patents-in-suit are "likely to be relevant" to accused infringer's product supports inference of intent to enforce the patents).  Next, Hyliion argues that its lack of "prior litigation history or history of enforcing" any of its patents "weighs against the existence of a real and immediate controversy with respect" to the Six Additional Patents.  Def.'s Mot. at 6:27–7:2.  True, "[a] history, or the lack thereof, of litigating in the industry can certainly be a factor to be considered." *Hewlett-Packard*, 587 F.3d at 1364 n.1.  However, this factor is not dispositive.  Pl.'s Opp. at 8:4–10.  Finally, Hyliion makes a passing reference to Range's conduct, arguing that Range's lack of current revenue and commercial activity shows a lack of immediacy and concreteness.  Def.'s Mot. at 8:1–16; Def.'s Reply at 6:1–11.  But Hyliion asserts that Range infringes its patents "based

---

[5] Because the Court concludes that Range properly alleges that Hyliion accuses it of directly infringing the Six Additional Patents, the Court need not decide whether Range also shows that jurisdiction exists for Range to pursue relief under a theory of indirect infringement. *Cf. Okta*, 2026 WL 497472, at *3 n.1 (concluding that if jurisdiction exists for plaintiff to pursue relief based on direct patent infringement, the court need not also address jurisdiction to pursue theories of indirect infringement).

21

on videos and images from the [Range] website." Pl.'s Opp. at 8:18–9:3 (citing Not. of Infringement). And in any event, Hyliion's argument proves too much—if true, "it would negate jurisdiction over all eight patents in suit, not just the additional six, and Hyliion does not make that argument." *Id.*; *see Mitek I*, 34 F.4th at 1340 (explaining declaratory judgment jurisdiction requires identified infringing activity by accused infringer).

Accordingly, the Court **DENIES** Hyliion's motion to dismiss Claims 1–5, 7, 9–13, and 15 in Range's Complaint.

**B.      Range's Motion To Dismiss Pursuant To Rule 12(b)(6)**

Range argues that Hyliion's patent infringement counterclaims both fail because they are premised on patent claims that are invalid under Section 101 of the Patent Act. Pl.'s Mot. at 1.

### 1.      Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (cleaned up). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Twombly*, 550 U.S. at 555 (citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *accord Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

22

*Iqbal*, 556 U.S. at 678.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up). A court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Courts have broader discretion in denying motions for leave to amend after leave to amend has already been granted. *See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) ("[W]hen the district court has already afforded a plaintiff an opportunity to amend the complaint, it has wide discretion in granting or refusing leave to amend after the first amendment, and only upon gross abuse will its rulings be disturbed.") (cleaned up); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad.") (cleaned up).

To overcome the presumption of validity, an accused infringer must prove patent invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). As such, while "patent eligibility can be determined at the Rule 12(b)(6) stage," such a motion can only invalidate a patent under 35 U.S.C. § 101 when "the complaint, the patent, and materials subject to judicial notice" show that the claims are patent-ineligible as a matter of law. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125, 1128 (Fed. Cir. 2018); *see also Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir. 2023) ("Patent eligibility is ultimately a question of law that may be based on underlying factual findings.").

### 2.    Patentable Subject Matter

Range argues that Claim 16 of the '853 Patent ("Claim 16") and Claim 1 of the '029 Patent ("Claim 1") (collectively, the "Asserted Claims") are invalid under Section 101 of the Patent Act because they recite patent-ineligible subject matter in the form of an abstract idea. Pl.'s Mot. at 1.

United States District Court
Northern District of California

Hyliion contends the Asserted Claims are not invalid because (1) they are not directed to an abstract idea but are instead directed to solving a technical problem; and (2) they contain inventive concepts. Def.'s Opp. at 1:12–25.

To be eligible for a utility patent, an invention must involve subject matter that can be patented under Section 101 of the Patent Act. 35 U.S.C. § 101 ("Section 101"). Section 101 defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof[.]" *Id.* "For all categories except process claims, the eligible subject matter must exist in some physical or tangible form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014).

There are three judicially created exceptions to patentable subject matter: laws of nature, natural phenomena, and abstract ideas. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980); *see Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) ("We have long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.") (cleaned up). Because these exceptions represent "the basic tools of scientific and technological work," permitting "monopolization of those tools through the grant of a patent" would tie "up the future use of these building blocks of human ingenuity." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (cleaned up). As such, patents that claim laws of nature, natural phenomena, and abstract ideas are patent-ineligible. *Id.* at 217.

The Supreme Court devised a test to distinguish patent claims that recite patent-ineligible subject matter from claims that recite patent-eligible applications of such subject matter. *See Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72–73 (2012) (setting forth framework for determining whether patent claims "transform an unpatentable law of nature into a patent-eligible *application* of such a law") (emphasis in original); *Alice*, 573 U.S. at 217–18 (extending *Mayo* to all categories of patent-ineligible subject matter). The *Mayo/Alice* test consists of two inquiries: (1) whether the patent claim is directed to a patent-ineligible concept; and (2) if so, whether the patent claim contains an inventive concept that adds significantly more to the patent-ineligible concept. *Alice*, 573 U.S. at 217–18; *accord DDR Holdings, LLC v.*

24

*Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

Here, on their face, Claim 16 and Claim 1 recite tangible things (a trailer and a towed vehicle, respectively) which are patentable subject matter. *See Aatrix*, 882 F.3d at 1125 ("A § 101 analysis begins by identifying whether an invention fits within one of the four statutorily provided categories of patent-eligible subject matter.") (cleaned up); 35 U.S.C. § 101 (listing machine as type of patentable subject matter); *Digitech*, 758 F.3d at 1348–49 (explaining "a machine" is "concrete thing, consisting of parts, or of certain devices and combination of devices"). The question is whether these claims are patent-ineligible because they recite an abstract idea. To succeed here, Range must show both that the Asserted Claims are directed to an abstract idea and that they lack and inventive concept. *See Alice*, 573 U.S. at 217–18 (explaining two-part test for determining patent-eligibility). The Court concludes that Claim 16 is patent-ineligible because it recites an abstract idea. However, the Court concludes that Claim 1 is patent-eligible—although Claim 1 is directed to an abstract idea, Hyliion plausibly alleges it contains an inventive concept.

Accordingly, the Court **GRANTS** Range's motion to dismiss Hyliion's Counterclaim 1 (alleging infringement of the '853 Patent) and **DENIES** Range's motion to dismiss Hyliion's Counterclaim 2 (alleging infringement of the '029 Patent).

### a.     *Mayo/Alice* Step One

Range argues that the Asserted Claims are directed to the same abstract idea of "controlling a trailer's motor-generator based on sensor data." Pl.'s Mot. at 3–8. Hyliion contends the claims "are directed to a specific technical solution to a genuine engineering problem: autonomous torque management without a communication link to the towing vehicle." Def.'s Opp. at 1, 3:6–19:19.

Step one of the *Mayo/Alice* test asks whether a claim is directed to a patent-ineligible concept. *Alice*, 573 U.S. at 217–18. At step one, courts must inquire if a patent claim's "character as a whole is directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). The focus is "on the language of the asserted claims, considered in light of the specification." *Hawk*, 60 F.4th at 1356. Where a claim is directed to eligible subject

matter, the inquiry ends.  *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).

"The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry."  *Enfish*, 822 F.3d at 1334.  Rather, both the Federal Circuit "and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."  *Id.*  Claims that focus on "solving a technological problem in conventional industry practice" or "improving an existing technological process" are not likely directed to an abstract idea.  *Alice*, 573 U.S. at 223.  Thus, the Federal Circuit has repeatedly emphasized the importance of looking at the patent's intrinsic record for facts alleging advantages and improvements.  *E.g., CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1372–73 (Fed. Cir. 2020); *see also Hawk*, 60 F.4th at 1356 ("Among other things, we examine what the patent asserts to be the focus of the claimed advance over the prior art.") (cleaned up).  But reliance on the specification must always yield to the claim language in identifying the true focus of the claim.  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 762 (Fed. Cir. 2019).

Here, the Court concludes that the Asserted Claims are both directed to abstract ideas.  Range argues that the Asserted Claims fail at step one because they "recite nearly-identical conventional physical elements directed to the same straightforward abstract idea:  controlling a trailer's motor-generator based on sensor data."  Pl.'s Mot. at 3–8.  Hyliion contends that the claims are directed to solving a technical problem using "hardware repurposed in a non-conventional manner."  Def.'s Opp. at 3:6–19:19.  It is clear from the face of the Asserted Claims that they involve the abstract idea of using sensor data and mathematical algorithms to control an electric motor-generator:  Claim 16 uses the data to determine the amount of supplemental torque provided by the electric motor-generator, and Claim 1 uses the data to determine transitions of the electric motor-generator between three modes of operation.  *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (explaining "collecting, displaying, and manipulating data" is an abstract idea); *DDR*, 773 F.3d at 1256 ("We know that mathematical algorithms, including those executed on a generic computer, are abstract ideas.").  However, "it is

26

not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is directed to." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (cleaned up); *see also Alice*, 573 U.S. at 217 ("At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.") (cleaned up).

The parties dispute whether the Asserted Claims are directed to solving a technical problem. To resolve this issue, it is helpful to turn to the "specification to understand the problem facing the inventor and, ultimately, what the patent describes as the invention." *ChargePoint*, 920 F.3d at 767 (cleaned up). Hyliion argues that the inventors solved the "problem of implementing an autonomous energy management system in a towed vehicle that is mechanically and communicatively isolated from its prime mover." Def.'s Opp. at 4:25–7:2. Range responds that the '853 Patent Specification does not support this proposition.[6] Pl.'s Reply at 1–4. The Court agrees. In "Description of the Related Art," the specifications for the Asserted Claims disclose that "techniques for reducing [fuel] costs" in trucking fleets are desirable, existing hybrid technology focuses "on hybridizing the drivetrain of a heavy truck or tractor unit, while any attached trailer or dead axles remain a passive load," and existing technology is limited because it only addresses "a small fraction of existing fleets" as it is used to introduce hybrid drivetrains in "new vehicles." '853 Patent at col. 1 ll. 24–27; '029 Patent at col. 1 ll. 36–60. Thus, the patents frame the challenge as reducing fuel costs of trucking fleets in a way that can be introduced in existing vehicles and is not limited to installing hybrid drivetrains in new vehicles.

Hyliion points to the specifications' "Summary" to support its proposition that the invention "confronted an engineering obstacle that the prior art had not solved: the trailer's electric drive system cannot directly observe or communicate with the tractor's engine and drivetrain." Def.'s Opp. at 5:7–24. But this section discloses information about the claimed

---

[6] Range complains that Hyliion refers to plural "specifications" to support its proposition but only cites to the '853 Patent. Pl.'s Reply at 2. However, the '853 Patent and '029 Patent contain the same background and summary information relevant to this inquiry. *Compare* '029 Patent at col. 1 ln. 29–col. 2 ln. 26 *with* '853 Patent at col. 1 ln. 16–col. 2 ln. 12. Therefore, the Court considers Hyliion's arguments citing to the '853 Patent equally applicable to the '029 Patent.

United States District Court
Northern District of California

United States District Court
Northern District of California

invention—it explains that the invention "does not itself participate in control of the fuel-fed engine or drivetrain" but instead relies "on operating parameters that can be observed and/or kinematic variables that are sensed to inform the controller." '853 Patent at col. 1 ln. 51–col. 2 ln. 29; '029 Patent at col. 1 ln. 64–col. 2 ln. 44; *see* Pl.'s Reply at 2 (asserting section "describes alleged invention embodiments, not the prior art"). Nowhere do the specifications state that a communication problem undergirds the use of hybrid tractor drivetrains in the prior art. Therefore, Hyliion does not plausibly allege that the Asserted Claims are directed to solving a technical problem.

Against this background, the language of the Asserted Claims shows that they are directed to an abstract idea because they are "directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Claim 16 recites a control system that uses sensor data to determine the amount of supplemental force provided by the electric motor-generator. '853 Patent at col. 32 ll. 17–38; *see* Pl.'s Mot. at 3. And Claim 1 recites a controller that uses sensor data to determine transition states of the electric motor-generator. '029 Patent at col. 24 ll. 31–64; *see* Pl.'s Mot. at 4. The focus of both Asserted Claims is using sensors to supply data to a control system that uses computations to effect changes in a motor-generator—the abstract idea of using sensor data and mathematical algorithms to control an electric motor-generator. Indeed, Hyliion frames the Asserted Claims as using sensors to provide data that serve as "the input to an algorithm whose output is . . . an estimate of another vehicle's hidden operational state." Def.'s Opp. at 7:18–21. "[S]electing certain information" (using sensors to gather certain data), "analyzing it using mathematical techniques" (using a control system), and "reporting or displaying the results of the analysis" (to the motor-generator) are all abstract. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). In addition—at least facially—the Asserted Claims recite generic elements that perform their standard functions; for example, a sensor detects observable parameters (like speed), a motor-generator provides positive force or receives negative force, and a control system controls the motor-generator. Pl.'s Mot. at 5. If this were not enough, the specifications make clear that the purpose of the invention is "to intelligently

28

control regeneration and reuse of captured energy in a TTR hybrid configuration." '853 Patent at col. 1 ll. 17–20; '029 Patent at col. 1 ll. 29–32. This amounts to "controlling the motor-generator based on sensor data." Pl.'s Mot. at 5–6. Therefore, the Court concludes that the Asserted Claims are directed to the abstract idea itself of using sensor data and mathematical algorithms to control an electric motor-generator.

Hyliion's argument that the Asserted Claims are not directed to an abstract idea because they perform processes "that cannot be performed mentally or manually on pencil or paper in real time as is required during the ever-changing driving conditions of the tractor and trailer" is misplaced. Def.'s Opp. at 6:9–14. Mental processes than can be performed in the human mind are abstract ideas. *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018). Using technology to make a mental process faster does not circumvent the prohibition against patenting abstract ideas and mental processes. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). And Hyliion does not assert that the calculations performed in the Asserted Claims could not be performed by a human; it asserts that the Asserted Claims allow for faster, continuous computation. *See* Pl.'s Mot. at 8 ("[T]he unspecified calculations the Two Asserted Claims make to control the motor-generator could be done in the human mind and are therefore equally abstract."); *contra SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295 1304, (Fed. Cir. 2019) (concluding claims not directed to abstract idea because "the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as recited by the claims").

Moreover, Hyliion's cited cases are inapposite. *See* Def.'s Opp. at 10–16 (citing *Thales*, 850 F.3d at 1343; *Jaguar Land Rover Ltd. v. Bentley Motors Ltd.*, 388 F. Supp. 3d 665 (E.D. Va. 2019); *EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634 (Fed. Cir. 2020); *Horizon Glob. Americas Inc. v. Cont'l Auto. Sys., Inc.*, 523 F. Supp. 3d 971 (2021); *Google LLC v. EcoFactor, Inc.*, 602 F. Supp. 3d 1265 (N.D. Cal. 2022); *Lime Green Lighting, LLC v. Brilliant NextGen Inc.*, No. 25-cv-00950-VKD, 2026 WL 828119 (N.D. Cal. Mar. 25, 2026)). In every case, the patent specification expressly disclosed advantages over the prior art. *See* Pl.'s Reply at 6–8. In *Thales*, the patent disclosed multiple advantages of the claimed system over the prior art's

United States District Court
Northern District of California

29

United States District Court
Northern District of California

conventional solutions for tracking inertial motion of an object on a moving platform—increased accuracy of measuring the tracked object, independent operation, and simpler installation.  850 F.3d at 1345.  In *Jaguar*, the patent disclosed that the claimed system "improves vehicle control technology by permitting a driver to control multiple subsystems at once and provides preset configurations of various subsystems for particular surfaces."  388 F. Supp. 3d at 677–78.  In *EcoServices*, the patent disclosed that "systems of the claims at issue achieve a level of automation that provides an improvement over the prior art human-operated washing systems"; the court stressed "[t]hese described advantages are important to our determination that the claims provide a technical improvement to jet engine washing."  830 F. App'x at 642–43.  In *Horizon*, the patent disclosed "then-known prior art brake control units . . . shortcomings of these brake control units [and] inventive embodiments directed to the shortcomings."  523 F. Supp. 3d at 983.  In *Google*, the patent disclosed shortcomings of prior art thermostats and how the claim "recites a specific implementation of pre-cooling that improves the operation of the technological HVAC system process."  602 F. Supp. 3d at 1271.  And in *Lime Green*, the claim language and written description indicated that the claimed invention was directed to achieving an improvement in lighting control technology.  2026 WL 828119, at *6–7.  In contrast, here, Hyliion does not point to anything in the specifications that shows the Asserted Claims are directed to improved communication between the tractor and trailer over the prior art.

Range also argues that the Asserted Claims are directed to an abstract idea because their physical features are conventional.  Pl.'s Mot. at 5–7.  Hyliion contends that the Asserted Claims recite "hardware repurposed in a non-conventional manner."  Def.'s Opp. at 7–9.  The Court addresses whether the claims recite non-conventional components below in its step two analysis.  *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) ("Recent cases, however, suggest that there is considerable overlap between step one and step two[.]").

Therefore, because the Asserted Claims are directed to an abstract idea, the Court next turns to step two of the *Mayo/Alice* framework.

### b.    *Mayo/Alice* Step Two

Range argues that the Asserted Claims "lack an inventive concept separate from the

abstract idea they are each directed to" because they "merely describe conventional components operating in their conventional manner." Pl.'s Mot. at 8–9. Hyliion contends that the Court cannot resolve the step two inquiry at the pleadings stage because the "patents' specifications are the only record before the Court, and they describe the invention as novel over existing hybrid vehicle technology." Def.'s Opp. at 19:20–24:3. Hyliion further contends that in the claims, "[e]ach major component is configured to perform a function it does not conventionally perform," and that the claims' "specific physical combinations provide inventive concepts well beyond their individual components considered in isolation." *Id.* at 7:3–9:28, 19:20–24:3.

Step two of the *Mayo/Alice* test asks whether the patent claim contains an inventive concept that adds significantly more to the patent-ineligible concept. *Alice*, 573 U.S. at 217–18. At step two, courts must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (cleaned up). A claim that recites only "well-understood, routine, conventional" elements lacks an inventive concept. *Mayo*, 566 U.S. at 73. At this step, courts also consider whether a claim recites an application of the patent-ineligible concept that renders the claim patent-eligible. *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1373 (Fed. Cir. 2017).

As with step one, the specification is critical to the inquiry in step two. *See CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021) ("Here, as the specification itself makes clear, the claims recite an inventive concept[.]"). However, "[t]o save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017). "And the abstract ideas alone are not an inventive concept." *NantWorks, LLC v. Niantic, Inc.*, No. 20-cv-06262-LB, 2024 WL 3363568, at *7 (N.D. Cal. July 9, 2024), *aff'd*, No. 2024-2216, 2026 WL 1098161 (Fed. Cir. Apr. 23, 2026) (citing *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018)).

"The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Therefore, on a Rule 12(b)(6) motion, plausible

31

allegations that, if accepted as true, establish that a claim contains inventive components preclude dismissal. *Aatrix*. 882 F.3d at 1125.

Here, the Court concludes that Hyliion fails to adequately allege that Claim 16 contains an inventive concept. However, the Court concludes that Hyliion adequately alleges that Claim 1 contains an inventive concept.

### i. Procedural Posture

Hyliion argues that dismissal is precluded because the '853 Patent and '029 Patent Specifications "describe the invention as novel over existing hybrid vehicle technology." Def.'s Opp. at 19:20–21:6. Novelty is "not necessarily enough to survive a § 101 challenge." *ChargePoint*, 920 F.3d at 773; *see* Pl.'s Reply at 14 ("At Step 2, the novelty of any element or steps in a process, or even of the process itself, is of no relevance.") (cleaned up). Only "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix*. 882 F.3d at 1126–27. As such, Hyliion cannot prevail by showing that Range "offers no evidence" that the components in the Asserted Claims are conventional; instead, Hyliion must point to allegations in its Answer (which contains its counterclaims) or in the '853 Patent/'029 Patent to survive dismissal. Def.'s. Opp. at 20:25–21:4; Pl.'s Reply at 12. Hyliion's Answer does not allege that the Asserted Claims contain an inventive concept. *See generally* Answer. And as discussed below, the allegations in the specifications only establish that Claim 1 contains an inventive concept, not Claim 16. Therefore, Claim 16 is amenable to dismissal.

### ii. Individual Elements

Hyliion next argues that the Asserted Claims use individual components that are non-conventional and "address the central engineering challenge of autonomous energy management in a towed vehicle that cannot observe or communicate with the vehicle towing it." Def.'s Opp. at 7:3–9:28. Range contends that the Asserted Claims describe conventional features operating in their conventional manner. Pl.'s Reply at 5.

First, for Claim 16, Hyliion argues that the sensors and control system are non-conventional. Def.'s Opp. at 7:10–8:20. Hyliion asserts that Claim 16 uses sensors in "a non-

32

conventional application" by using them to estimate the towing vehicle's "hidden operational state." *Id.* at 7:10–21. However, in the same paragraph, Hyliion states that "the control system must derive the tractor's instantaneous torque contribution," not the sensors. *Id.*; *see* Pl.'s Reply at 5. And Hyliion does not point to anything in the '853 Patent Specification disclosing that the sensors are used in a non-conventional way. *See* '853 Patent at col. 18 ll. 41–51 (discussing "on-board sensors"), cl. 16 (reciting "on-board sensors"). Hyliion then asserts that the control system in Claim 16 performs "a novel two-step inference and optimization that prior art systems were not designed to execute and had no need to attempt." Def.'s Opp. at 7:12–8:20. For support, Hyliion states that the control system employs an inventive ECMS-type controller and "performs two distinct and non-conventional computations, neither of which appears in prior art trailer systems." *Id.* There are several problems with these assertions. For one, the specification discloses that an ECMS-type controller is but one embodiment of the control system recited in Claim 16. *See* Pl.'s Reply at 3, 5–6; '853 Patent at col. 17 ln. 12–col. 18 ln. 30 ("A variety of control systems designs are contemplated[.]"), col. 2 ln. 12 ("In some embodiments an ECMS-type controller . . ."). It is hornbook patent law that "the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint*, 920 F.3d at 769; *see* Pl.'s Reply at 5–6. Because an ECMS-type controller is not recited in Claim 16, it cannot supply an inventive concept. Hyliion's assertion regarding the computations suffers from the same flaw. Hyliion frames the first computation as "a physics-based torque decomposition that accounts for road grade, aerodynamic drag, rolling resistance, acceleration, and driver input torque[.]" Def.'s Opp. at 8:4–8. But this is not reflected in the claim language or the specification. The sensor data limitation in Claim 16 requires one of trailer position data, trailer weight data, trailer speed data, or trailer acceleration data, while the Specification discloses that some embodiments account for other parameters like road grade and driver input. '853 Patent at col. 3 ll. 4–12, cl. 16; *see* Pl.'s Reply at 13–14. And again, Hyliion does not point to information in the specification indicating "that earlier trailers didn't do the '853 patent's computations." Pl.'s Reply at 5, 14.

     Second, for Claim 1, Hyliion argues that the electric motor-generator and suspension assembly are non-conventional. Def.'s Opp. at 8:21–9:18. Hyliion asserts that the electric motor-

generator recited in Claim 1 does not perform conventionally because it is "configured to autonomously cycle among three modes based on a trailer-mounted controller's real-time energy optimization." *Id.* at 8:21–9:5. But nothing in the specification supports this proposition. Pl.'s Reply at 6. Moreover, Hyliion's argument that the "passive (zero net torque) state" limitation in Claim 1 is significant because it "is an affirmative operational state that the system must actively select" is unpersuasive. Def.'s Opp. at 6:15–24; *see id.* at 8:27–28 ("Dependent claim 2 further specifies that the third mode is a passive mode[.]"). Claim 2 of the '029 Patent recites an additional limitation: "in the third mode of operation, the at least one electric motor-generator operates in a passive mode." '029 Patent at col. 24 ll. 65–67. But that limitation cannot be part of Claim 1. For dependent claims are construed more narrowly than independent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–15 (Fed. Cir. 2005) (en banc) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Put another way, while the undefined "third mode of operation" limitation in Claim 1 may include one that operates in a passive mode, the limitation does not *require* such a construction. Indeed, the '029 Patent Specification confirms that this is true, stating: "Thus, in some examples, the third mode of operation may be referred to as a 'passive mode.'" '029 Patent at col. 8 ll. 51–52. Therefore, because Claim 2 cannot supply the inventive concept for Claim 1, Claim 2 is immaterial to the Court's analysis of Claim 1. *See* Pl.'s Reply at 6 n.3. Hyliion then asserts that Claim 1 involves the non-conventional use of suspension components "as the integration platform for the electric drive system" in the trailer. Def.'s Opp. at 9:6–18. Hyliion discusses this element as it relates to the motor-generator and drive axle, *i.e.* the "electromechanical drive system." *Id.* The Court therefore discusses the suspension assembly as part of an ordered combination below.

### iii.    Ordered Combination

Finally, Hyliion argues that "the Asserted Claims' specific physical combinations provide inventive concepts well beyond their individual components considered in isolation." Def.'s Opp. at 21:7–24:3.

First, Hyliion argues that Claim 16 "contains an inventive concept in its specific two-part

United States District Court
Northern District of California

method of torque management, each step of which is independently non-conventional and which together define a novel computational architecture not found in prior art trailer systems." *Id.* at 21:14–22:7. Range contends that Hyliion's "alleged inventive steps are merely the abstract idea itself," and that Hyliion does not "point to statements from the specification suggesting that there is anything unconventional or not routine about using computations." Pl.'s Reply at 12–14. The Court agrees with Range. Hyliion asserts that the type of computations recited in Claim 16 are non-conventional. But the '853 Patent Specification gives no indication that the patented invention uses torque calculations to control a motor-generator in an unconventional way. *Cf. ChargePoint*, 920 F.3d at 774. Put simply, Hyliion argues that using sensor data to calculate torque values to provide supplemental torque by a trailer is an inventive concept. This is tantamount to asserting that the abstract idea—using sensor data and math to control a motor-generator—is the inventive concept, which is foreclosed under Federal Circuit precedent. *See BSG*, 899 F.3d at 1290 ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."). Further, Hyliion's assertion that Claim 16 employs "a novel approach over prior art that required direct communication or driver input" is not supported by the '853 Patent Specification. Def.'s Opp. at 22:6–7. The portions of the '853 Patent that Hyliion points to describe the invention generally or embodiments not claimed by Claim 16, not the prior art. *See* '853 Patent at col. 2 ll. 1–29 (disclosing invention "does not itself participate in control of the fuel-fed engine or primary drivetrain"), col. 7 ll. 13–37 (discussing embodiments containing "a hybridized suspension assembly"), cl. 16 (reciting elements of on-board sensor, control system, electric motor-generator, trailer axle), cl. 17 (reciting additional limitation of "hybrid suspension system"). Therefore, Hyliion does not plausibly allege that Claim 16 contains an inventive concept.

Second, Hyliion argues that Claim 1 contains an inventive concept because the "autonomous operation limitation, combined with the specific physical architecture of the suspension assembly, axle-coupled motor-generator, and energy store, describes a specific technical implementation that solves a real engineering problem in towed-vehicle electrification."

35

Def.'s Opp. at 9:6–18, 22:8–15. Range contends that Hyliion's "alleged inventive step is merely a more specific restatement of the abstract idea." Pl.'s Reply at 14. Not so. Overall, Hyliion plausibly alleges that the combination of a suspension assembly with an embedded electrified drive axle and an autonomous controller that transitions between modes of providing supplemental torque and regenerative braking is an inventive concept that achieves the twin aims of improving fuel efficiency and the ability to retrofit existing vehicles. Recall that the problem the inventors faced was reducing fuel costs of trucking fleets in a way that can be introduced in existing vehicles and is not limited to installing hybrid drivetrains in new vehicles. '029 Patent at col. 1 ll. 36–60. Hyliion explains that the "suspension assembly is the mechanical integration platform for an electromechanical drive system"; that the suspension assembly "enables the retrofit installation onto existing trailers" by replacing the "trailer's conventional passive axle assembly with an active electromechanical one"; and that the "autonomous three-mode operational architecture" manages energy flow. Def.'s Opp. at 9:6–18. The specification supports that the combination of autonomous torque control with the physical suspension assembly is a potential inventive concept. *See* '029 Patent at Abstract (disclosing claimed technology is built into new vehicles in some cases and retrofitted onto existing vehicles in some cases), col. 5 ll. 39–52, col. 8 ll. 1–5 (disclosing hybridized suspension assembly can be affixed underneath a vehicle as a replacement to a passive suspension assembly and "is configured to operate largely independently of the fuel-fed engine and primary drivetrain of a powered vehicle"), col. 8 ll. 53–58 (disclosing that by providing a powered axle to a towed vehicle, the hybrid suspension system results in a significant reduction in fuel consumption and improvement in fuel efficiency of the towing vehicle). Notably, this inventive concept is evident on the face of Claim 1 which recites "a suspension assembly," an "electric-motor generator" that can provide positive force and receive negative force to generate "energy by regenerative braking," and "a controller that operates autonomously." '029 Patent at col. 24 ll. 31–64; *see RecogniCorp*, 855 F.3d at 1327 ("To save a patent at step two, an inventive concept must be evident in the claims."). As such, unlike Claim 16, Hyliion alleges that Claim 1 takes the abstract idea of using sensor data and math to control a motor-generator and adds more: a way to retrofit existing towed vehicles with active electrified drive axles that reduces fuel costs

36

by autonomously managing energy. *See Mayo*, 566 U.S. at 78 (explaining at step two, courts ask "[w]hat else is there in the claims before us?"). In sum, although the specification does not describe the individual claim limitations as inventive, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–50 (Fed. Cir. 2016); *see* Def.'s Opp. at 20:19–24 (stating inventive concept lies in "the specific combination of autonomous control, torque-estimation computation, three-mode motor-generator operation, and integrated electromechanical suspension assembly"). Therefore, Hyliion plausibly alleges that Claim 1 contains an inventive concept.

### 3. Leave To Amend

In its Opposition, Hyliion does not request leave to amend its counterclaims. However, the Court must grant leave to amend unless it determines that any deficiencies cannot be cured by the allegation of other facts. *Lopez*, 203 F.3d at 1127. Although the Court is skeptical that additional allegations can establish that Claim 16 is patent-eligible, the Court cannot definitively say that amendment would be futile. *Cf. Haley IP, LLC v. Motive Techs., Inc.*, No. 23-cv-02923-HSG, 2023 WL 7003265, at *5 (N.D. Cal. Oct. 23, 2023) (granting leave to amend infringement claims upon concluding claims were based on patent-ineligible invention). Accordingly, the Court will grant Hyliion one opportunity to file amended counterclaims.

## IV.   CONCLUSION

For the reasons stated above, the Court **DENIES** Hyliion's Motion to Dismiss and **GRANTS IN PART and DENIES IN PART** Range's Motion to Dismiss. Hyliion shall file any amended counterclaims within fourteen days.

**IT IS SO ORDERED.**

Dated: June 26, 2026

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

37